UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

CONSTRUCTION AND GENERAL
LABORERS' LOCAL UNION NO. 330
and KELLY BUSS,

                Plaintiffs,

      v.                                   Case No. 14-C-455

TOWN OF GRAND CHUTE,

                Defendant.

---

## DECISION AND ORDER

---

In late March 2014, the Code Enforcement Officer for the Town of Grand Chute ordered a labor union to remove a giant inflatable rat it had staked to the ground in the public right-of-way of a main thoroughfare. The rat, along with a giant inflatable "fat cat" grasping a worker around the neck, were being used as part of a labor protest against a local business that was using a non-union contractor for an expansion project. The Officer explained that staking the rat to the ground in the public right-of-way violated the Town's sign ordinance, which in general prohibited all signs, except traffic-related signs, on public rights-of-way. The Union, Construction and General Laborers' Local Union No. 330, complied with the Officer's instructions and then commenced this lawsuit under 42 U.S.C. § 1983, claiming that the Town's sign ordinance, on its face and as applied, violated the Union's rights to free speech and assembly under the First and Fourteenth Amendments of the United States Constitution and Sections 3 and 4 of Article I of the Wisconsin Constitution. The Union's complaint asserted demands for declaratory and injunctive relief, as well as damages for the expenses for the additional manpower needed to conduct the protest without the inflatables.

The case first came before me on the Union's motion for a preliminary injunction to enjoin the Town from enforcing its ordinance so as to prohibit the Union's use of the giant inflatable rat and cat as part of its protest. The Union claimed that the ordinance was unconstitutional on its face, and alternatively, that the Town discriminated on the basis of content in its enforcement of the ordinance. Following a hearing, I issued a decision denying the Union's motion on April 29, 2014. ECF No. 12. In so ruling, I held that the Town's ban on non-traffic-related signs in the public right-of-way was content neutral and that the Union had failed to establish a likelihood of success on its claim that the ordinance was enforced in a discriminatory manner. *Id.* The Union did not appeal at that time.

The parties then conducted discovery and, upon completion, filed cross motions for summary judgment. On April 13, 2015, I granted the Town's motion and denied the Union's. ECF No. 42. In so ruling, I reaffirmed my preliminary conclusion that the ordinance was content neutral and constituted a reasonable exercise of the Town's authority to enact time, place and manner restrictions on signs on a public right-of-way. I further concluded that the Union had failed to offer any evidence that would place in dispute the Town's claim that its ordinance was enforced without regard to the content of the signs affected. Acknowledging that the evidence might show that enforcement of the ordinance was not perfectly uniform, I concluded that the Union had failed to show discriminatory enforcement. I also rejected the Union's argument that the fact that enforcement was sometimes triggered by citizen complaints transformed it into content-based discrimination. *Id.* at 14–15. Judgment in favor of the Town and dismissing the complaint was entered on April 13, 2015. ECF No. 43.

The Union appealed, and on August 19, 2016, the Court of Appeals in a divided opinion vacated the judgment and remanded the case for a determination of (1) whether the case was moot

since the project the Union was picketing was completed and a new ordinance had been enacted and, if not, (2) whether the Town was selectively enforcing its ordinance based on the content of the sign at issue. *Const. & Gen. Laborers' Local Union No. 330 v. Town of Grand Chute*, 834 F.3d 745, 748–50 (7th Cir. 2016). A majority of the three-judge panel appears to have affirmed this court's holding that the ordinance was content neutral and thus constitutional on its face. Judge Posner, on the other hand, in his partial dissent, seemed to conclude that it was not enough if the ban was content neutral: "For an ordinance to be allowed to curtail a constitutional right, it must be grounded in a legitimate public concern." *Id.* at 754, (Posner, J., concurring in part and dissenting in part). He found the concerns offered by the Town, aesthetics and safety, "spurious as applied to the union rat" and perhaps even more so as to the cat. *Id.* The majority expressed the hope that "if this suit still presents a live controversy, the district judge will proceed with dispatch appropriate to the nature of the constitutional claim." *Id.* at 750.

The Court of Appeals mandate issued on September 12, 2016. On October 19, 2016, the court held a status conference and set a briefing schedule on the issue of mootness. The briefing was completed on January 31, 2017, and on February 3, 2017, the court issued its decision finding that the case was not moot since (1) the Union continued to seek damages for extra expenses it incurred in staffing its protest as a result of the Town's enforcement of its ordinance, and (2) the issue was likely to recur and the Town indicated the result would be the same under its new ordinance. ECF No. 64. The Union then filed an amended complaint adding a claim that under the new ordinance ("the 2015 Ordinance") it would likewise be prevented from using its inflatable rat and cat at another labor demonstration in violation of its First Amendment rights. Following additional discovery, a trial to the court was held on August 7, 2017. Post trial briefing is now complete and the case is

ready for decision. For the reasons that follow, I now conclude that the Town did not discriminate against the Union based on the content of its speech in its enforcement of the sign ordinance in effect at the time the case arose ("the 2014 Ordinance") and reaffirm my conclusion that the Town's ban on signs on the public right-of-way is constitutional. I also conclude that the 2015 Ordinance is not unconstitutional as applied to affixing the Union's inflatables on the public right-of-way. Before setting forth my findings of fact and conclusion of law on the issues remaining, however, it will be helpful to review once again the law governing local sign ordinances and the First Amendment.

**A. The Town's Local Sign Ordinance and the First Amendment**

Like many municipalities, the Town of Grand Chute regulates the display of outdoor signs by ordinance. Grand Chute Code, Ch. 535, Art. XV. The Town enacted its sign ordinance "to establish standards to safeguard life and property and promote public welfare and community aesthetics by regulating the appearance, construction, location and maintenance of all signs and billboards." § 535-104. The ordinance prohibits the posting of private signs on the public rights-of-way. § 535-106C. It defines "sign" broadly to include "any structure, part thereof, or device attached thereto or painted or represented thereon which displays or includes any numeral, letter, word, model, banner, emblem, device, trademark or other representation used as, or in the nature of, an announcement, advertisement, direction or designation of any person or thing in such a manner as to attract attention from outside of the building." § 535-105. It is the ordinance's ban on placement of signs on the public right-of-way that the Union challenges here.

It is not unusual for sign ordinances, such as the Town's, to give rise to First Amendment challenges. This is because signs "pose distinctive problems that are subject to municipalities' police powers," yet they are also "a form of expression protected by the Free Speech Clause." *City of*

*Ladue v. Gilleo*, 512 U.S. 43, 48 (1994). Regulations limiting speech are generally valid if they: (1) are content neutral; (2) are narrowly tailored to serve a significant government interest; and (3) leave open ample alternative channels for communicating the information. *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). In *Gilleo*, the Supreme Court identified "two analytically distinct grounds for challenging the constitutionality of a municipal ordinance regulating the display of signs." 512 U.S. at 50.

The first ground upon which sign ordinances are frequently challenged is that the ordinance "in effect restricts too little speech because its exemptions discriminate on the basis of the signs' messages." *Id.* at 51. Thus, in *Reed v. Town of Gilbert*, 135 S. Ct. 2218 (2015), the Court struck down a sign ordinance that imposed different restrictions on signs based on the type of information conveyed. Under the First Amendment, the Court held, "[c]ontent-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve a compelling state interest." *Id.* at 2226.

The second ground for challenging the constitutionality of sign ordinances is that "they simply prohibit too much speech." *Gilleo*, 512 U.S. at 51. *Gilleo* held that a sign ordinance that prohibited homeowners from displaying any signs on their property except "residence identification" signs, "for sale" signs, and signs warning of safety hazards was unconstitutional because it completely closed off a cheap and convenient medium homeowners used to communicate with neighbors and the public, and violated that "special respect for individual liberty in the home [that] has long been part of our culture and law." *Id.* at 57–58.

Neither ground identified by *Gilleo* is available here for challenging the 2014 Ordinance's ban on signs in the public right-of-way. The second ground of attack—that the ban prohibits too much speech—is foreclosed by *Members of City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789 (1984). As the Seventh Circuit noted in this very case, *Taxpayers for Vincent* "holds that a city may ban all private signs (including political ones) from the public way." *Const. & Gen. Laborers' Local Union No. 330*, 834 F.3d at 748. The justification for such an ordinance includes public safety, but it is not limited to safety considerations. "It is well settled that the state may legitimately exercise its police powers to advance esthetic values." *Taxpayers for Vincent*, 466 U.S. at 805. Indeed, in *Taxpayers for Vincent*, the Court reaffirmed its previous holding that the problem addressed by such ordinances—"the visual assault on the citizens of Los Angeles presented by an accumulation of signs posted on public property—constitutes a significant substantive evil within the City's power to prohibit." *Id.* at 807 (citing *Metromedia, Inc. v. San Diego*, 453 U.S. 490 (1981)). "The city's interest in attempting to preserve or improve the quality of urban life," the Court held, "is one that must be accorded high respect." *Id.* (quoting *Young v. Am. Mini Theatres, Inc.*, 427 U.S. 50, 71 (1976) (plurality opinion)). The Town of Grand Chute has the same interest, and as in *Taxpayers for Vincent*, its ordinance is directed at the very evil it seeks to eliminate and leaves ample alternative methods of communication.

Of course, even though the purpose behind such an ordinance includes the advancement of aesthetic values, the attractiveness or unattractiveness of any particular sign, just as one's agreement or disagreement with the message it conveys, is irrelevant. Indeed, were a municipality to construe its ordinance so as to allow some signs on the public right-of-way because the enforcement officer liked the color, or the fact that they depicted cute animals such as cats, or because it advanced a pro-

6

union or pro-life cause with which he agreed, a First Amendment violation would be established by that fact alone. Allowing cats but not rats, or pro-union message signs but not pro-life signs, would render the ordinance a content-based regulation. *See Taxpayers for Vincent*, 466 U.S. at 816 ("To create an exception for appellees' political speech and not these other types of speech might create a risk of engaging in constitutionally forbidden content discrimination."). The Court of Appeals made that very point in this case:

> The ordinances in Grand Chute are comprehensive and content-neutral, and decisions such as [*Clark v. Community for Creative Non–Violence*, 468 U.S. 288 (1984),] and *Taxpayers for Vincent* hold that a governmental body need not make ad hoc exceptions to such rules. To the contrary, limiting official discretion about who is entitled to speak is a vital goal of the Supreme Court's jurisprudence under the First Amendment. See *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 130–31, (1992); *Niemotko v. Maryland*, 340 U.S. 268 (1951). The sort of ad hoc exception that the Union wanted Grand Chute to make (on the ground that the rat and cat did not jeopardize traffic safety and were only temporary) not only would have transgressed the rule against open-ended discretion but also would have created a form of content discrimination. See *United States v. Stevens*, 559 U.S. 460, 470–71 (2010); *Houston v. Hill*, 482 U.S. 451, 465–67 (1987). That in turn would have called into question the Town's entitlement to enforce its ordinance against anyone. See, e.g*., Reed v. Gilbert*, 135 S.Ct. 2218 (2015).

*Const. & Gen. Laborers' Local Union No. 330*, 834 F.3d at 749. This unequivocal holding by the Seventh Circuit majority—that the Grand Chute ordinance is "comprehensive and content-neutral"—forecloses the first ground of facial attack recognized by the Court in *Gilleo*.

In addition to the two grounds identified in *Gilleo*, however, the Union has pointed to a third ground for a facial challenge to a local ordinance restricting the exercise of First Amendment rights that has been recognized by the Court. Where the ordinance requires a person to obtain a permit in order to engage in protected activity and then vests unbridled discretion in a government official to grant or deny the permit, the ordinance is facially unconstitutional. *City of Lakewood v. Plain*

*Dealer Pub. Co.*, 486 U.S. 750, 759 (1988). In *City of Lakewood*, the challenged ordinance gave the mayor authority to grant or deny applications for permits to place coin-operated newsracks on city sidewalks. *Id.* at 753. Plain Dealer Publishing Company, a newspaper publisher, elected not to seek a permit but instead challenged the facial constitutionality of the ordinance. *Id.* at 754. The Supreme Court upheld the newspaper publisher's challenge, noting that "our cases have long held that when a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity, one who is subject to the law may challenge it facially without the necessity of first applying for, and being denied, a license." *Id.* at 755–56; *see also Smith v. Exec. Dir. of Ind. War Mem'ls Comm'n*, 742 F.3d 282, 289 (7th Cir. 2014) ("To qualify as content-neutral, a permit policy cannot invest 'unbridled discretion' in the person who decides whether a permit will issue because excessive discretion can lead to discriminatory enforcement." (citing *Thomas v. Chi. Park Dist.*, 534 U.S. 316, 323 (2002))).

Pointing to Section 535-108B(11) of the 2014 Ordinance, the Union argues that the fact that the 2014 sign ordinance grants unbridled discretion to the Code Enforcement Officer to grant permits for temporary signs renders the ban on the placement of signs in the public right-of-way facially unconstitutional. Section 535-108B(11), entitled "Temporary signs, banners and balloons for special events," reads:

> A temporary sign(s) for the purpose of designating a new building or development, for the promotion of a subdivision, for announcement of a special (sales) event or for similar special informational purposes may be permitted for a limited period of time in any district with the approval of the Zoning Administrator and subject to the following:

> (a)     The permitted size and location of any such sign shall be at the discretion of the Zoning Administrator based on the character of the area, the type and purpose of the sign(s) and the length of the time permitted.

8

(b)     Where the sign(s) is to be located on the premises involved, such may be permitted for a period of up to 10 days. Off-premises temporary signs shall be permitted for 30 days maixmum.

(c)     Drawings showing the specific design, appearance and location of the sign(s) shall be submitted to the Zoning Administrator for approval.

But as the Code Enforcement Officer explained, this provision applies to signs that are located on private property. ECF No. 93 at 111–12. Given the discretion allowed for issuance of a permit for placement of temporary signs on private property, this provision may well be unconstitutional. But it has no bearing on this case because the only place the Union ever attempted to place its inflatable rat and cat was on the public right-of-way. Even if the temporary sign provision did apply, it would not have helped the Union here. Section 535-108B(16) states: "No part of an inflatable temporary sign shall encroach into or over the public right-of-way or be situated so as to obstruct or impair vision or traffic or in any manner create a nuisance, hazard or disturbance to the health or welfare of the public." The Union is not entitled to relief simply because a provision of the ordinance unrelated to its own activities might be unconstitutional. The specific provision of the 2014 Ordinance at issue reads: "Signs shall not be permitted on public rights-of-way except for traffic control, parking and directional signs and as otherwise specified in this article." § 535-106C. As the Court acknowledged in *Reed*, "on public property, the Town may go a long way toward entirely forbidding the posting of signs, so long as it does so in an evenhanded, content-neutral manner." 135 S. Ct. at 2232 (citing *Taxpayers for Vincent*, 466 U.S. at 817). That leaves only the Union's claim that the Town's enforcement of its sign ordinance was content based.

In *Reed*, the Court held that the sign ordinance there at issue was content based on its face. 135 S. Ct. at 2227. This is because different restrictions applied depending upon the category into

which the sign fell, and the category into which any particular sign fell was dependent on its content. *Id.* The fact that the defendant town was not motivated by discriminatory intent—that its justifications for enacting the ordinance were unrelated to the content of the sign—was irrelevant. "A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech." *Id.* at 2228 (citing *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429 (1993)).

The same is not true, however, for "as applied" challenges to enactments that are facially neutral. Where the challenge is to the manner in which a content-neutral ordinance has been, or can be applied, the intent of the enforcement officer is crucial. *Id.* at 2228–29. For a content-neutral ordinance, "[t]he government's purpose is the controlling consideration." *Ward*, 491 U.S. at 791. This is because an "as applied" challenge in this context is, in essence, a claim that the content-neutral ordinance which is constitutional on its face is being enforced in such a way as to discriminate against the speaker or message. To prevail on such a claim, a plaintiff must show that the ordinance was designed to suppress certain ideas that the Town finds distasteful or that it has been applied to the plaintiff because of the views that he expresses. *Taxpayers for Vincent*, 466 U.S. at 804.

## B. Issues on Remand

It is this last issue that the Seventh Circuit directed this court to address on remand in the event the case was found not to be moot. The Court of Appeals explained that "the Union maintains . . . that the Town has undercut its own ordinance by selective enforcement, permitting messages of which it approves while enforcing the ordinance against unions and other unpopular speakers. If the ordinance *in operation* discriminates according to the content of speech, then only

10

a compelling justification could save it, and the Town has not argued that it has the sort of justification that would authorize content discrimination." *Const. & Gen. Laborers' Local Union No. 330,* 834 F.3d at 749. Although in granting the Town's motion for summary judgment, I had concluded that the Union produced no evidence that the Town invidiously discriminated in its enforcement of the ordinance on the basis of the content or source of the signs, the Court of Appeals read *Reed* as saying the Enforcement Officer's intent was not required: "*Reed* tells us that content discrimination is almost always forbidden. If this suit is live, the Union's claim of content discrimination cannot be dismissed on the ground that the Town lacks an 'invidious reason' for preferring some speech over other speech." *Id.*

The Court of Appeals then pointed to the Union's contention that a number of signs posted by firefighters were allowed to remain undisturbed even though they violated the Town's ordinance. The Union had characterized the Town's failure to remove these signs as "constitutionally problematic" because the signs at issue belonged to the Town's own employees and because, when shown a picture of the signs at deposition, the Town's Code Enforcement Officer testified that the signs might in fact be legal, assuming the owners were attending them since they were not affixed to the ground. ECF No. 42 at 15–16. It was significant whether the signs the firefighters used were affixed to the ground because the Town had construed the ordinance so as to allow signs that people carried with them or leaned against their lawn chair or car as they engaged in picketing or protesting on public sidewalks. The requirement that such signs be attended and not affixed to the ground was apparently intended to prevent groups from circumventing the ordinance by installing large signs on the public right-of-way and then arranging for individual members to takes shifts around the clock to attend them. In any event, because the Union offered no evidence that the Town's construction

11

or enforcement of the ordinance was motivated by the content of the sign, I concluded that the evidence concerning the fire department signs was not material. The Court of Appeals concluded that this was error:

> As for "it could be legal": the district judge needs to determine whether the signs were (or are) legal under the ordinance. If the Town is distinguishing among speakers covered by the ordinance, it must meet the Supreme Court's standards for content discrimination. That the Town's police did not tell the Union to remove the rat and cat until the target of the Union's campaign complained offers further support for the Union's contention that enforcement depends on speakers' messages. (The rat and cat were easily visible to the police, who ignored them for two days until the complaint was made.)

834 F.3d at 750.

Finally, the Court of Appeals noted the Union's contention that "the Town has allowed other speakers 30 days to remove structures that violate the ordinance, while it insisted that the Union remove the rat and cat immediately." *Id*. I had noted in rejecting this argument in my decision granting the Town's motion for summary judgment that although the form on which the Union relied included language that allowed a property owner 30 days in which to correct a violation on his property, the handwritten note of the Code Enforcement Officer "plainly states that the sign (which was a billboard on private property that violated a different ordinance) must be removed within 48 hours." ECF No. 42 at 19 (citing ECF No. 24-2 at 12). The Court of Appeals noted, however, that other forms cited by the Union did not modify the form language, leaving open the question whether other violators of the sign ordinance were treated differently. The Court of Appeals concluded: "The district court needs to make findings about the Town's actual enforcement practices—unless this controversy is moot." 846 F.3d at 750.

12

Having now heard the evidence presented by the parties at trial, it is to those issues that I now turn and make the following findings of fact as to the Union's original claim under the sign ordinance as it existed in 2014.

## C. Findings of Fact and Conclusions of Law as to the Claim Under the 2014 Ordinance

On March 28, 2014, the Union's president Kelly Buss learned that Pahlow Masonry, which allegedly paid its workers substandard wages and benefits, was being used on a job involving the expansion of a Kolosso car dealership on West College Avenue in the Town of Grand Chute. The Union decided to engage in an area standards protest at the dealership and called the Grand Chute Police Department ("GCPD") to inform it of its plans and determine a location where it could safely protest. Buss and Lt. Randy Reifsteck of the GCPD met on May 29th in front of Kolosso. The two discussed safety concerns, such as where to park and where the picketing could take place without obstructing traffic or placing picketers in harm's way. Reifsteck testified that although Buss mentioned the Union would use handheld signs, there was never any mention of plans to use any inflatable signs. Buss testified that he did not mention the possible use of inflatable signs with Reifsteck because the Union was still uncertain at that time if it would use one.

The Union began its informational picket on March 31, 2014 at approximately 7:30 a.m. The site of the picket was across from Kolosso on the median between West College Avenue and a frontage road that ran parallel to it. In addition to displaying handheld signs which identified the Union as the party engaging in the protest and Pahlow as the subject of the dispute, the Union displayed a large inflatable rat, as shown below:



 The inflatable rat was approximately 12 feet tall and secured to the ground with four straps connected to stakes that had been driven into the ground. A second inflatable depicting a "fat cat" wearing a business suit and strangling a construction worker was also was eventually used, but only for two days. Buss testified that the Union kept the rat inflated only when Pahlow was on site and that it took only about one minute to inflate or deflate the rat. He claimed that without the inflatable signs, the Union's protest would be ineffective because there was no foot traffic to pass out handbills and that the rate of traffic was too busy to effectively use a banner.

 On one of the first two days of the Union's protest, Eric Thiel, the Grand Chute Code Enforcement Officer, was notified by the Town's chairman that there had been a complaint about the inflatable rat. Thiel was the primary person responsible for enforcing the Town's sign ordinance. The police department might help out on weekends or after hours, but generally Thiel alone was responsible for enforcement. Thiel testified that he assumed Kolosso was the complainant because the rat was in front of its building, but that the Town's chairman did not tell him the source specifically and he did not inquire further about it.

Thiel explained that his job responsibilities included the enforcement of various zoning ordinances (such as the sign ordinance), which accounted for approximately a quarter of his total work. He testified that he finds the majority of his sign ordinance violations while driving around the Town; however, he does occasionally investigate a complaint about a sign that he receives from either a citizen or a member of his staff. Thiel testified that when he receives a citizen complaint about a sign, the complainant normally does not indicate why he or she is complaining about a given sign and Thiel does not ask. Furthermore, he testified that his standard practice to enforce the Town's sign ordinance after a complaint was to go to the site and investigate in person. If he deemed a sign in violation of an ordinance, he would either remove the sign immediately or talk to the property owner and inform the owner that he or she needs to remove the sign.

Buss testified that Thiel arrived at the protest site at approximately 8:30 a.m. on April 1st. Thiel informed Buss that the rat was in violation of Section 535-108 of the Town's sign ordinance and instructed the Union to deflate the rat and to stop using it as a sign. Buss then contacted Reifsteck to get a second opinion about whether the rat was legal under the sign ordinance. Reifsteck testified that the ordinance which Buss was given appeared to involve commercial signs only and told Buss that the Union could continue to use the rat because it was for a non-commercial purpose. The rat was deflated for only approximately one hour from the time Thiel requested that the Union deflate it and Reifsteck instructed the Union it could re-inflate it. At trial, Thiel testified that he cited the wrong statute (§ 535-108) when he initially told the Union to take the rat down, but the reason he asked it to deflate the rat was because it was in the public right-of-way, which is a violation of Section 535-106C.

Buss testified that the Union used the rat for the entirety of April 2nd with no enforcement action by the Town. On April 3rd, the Union was approached by the Code Enforcement Officer for the City of Appleton. The officer informed the Union that its rat was actually located in the City of Appleton—not the Town of Grand Chute, and that it would either need to be moved or deflated. The Union then moved the rat onto the other side of the frontage road and off the median so it would be in the Town of Grand Chute. The rat was inflated for the rest of the day. The Union did not use the rat on April 4th, 5th, or 6th.

Thiel testified that he was aware that the Union had re-inflated the rat but did not take immediate action because there was confusion as to whether or not the rat was a sign and whether or not it violated the Town's ordinances. On April 3rd, Thiel, Reifsteck, Grand Chute Police Chief Greg Peterson, and Community Development Director Robert Buckingham met to discuss whether the rat was in violation of the Town's sign ordinances. Thiel testified that it was not standard practice to have a meeting involving these four individuals but it was necessary in light of the conflicting messages being sent by Thiel and Reifsteck. Eventually, all parties at the meeting agreed that the inflatable rat was a "sign" within the meaning of the Town's original ordinance and that the prohibition on structural signs within public rights-of-way, Section 535-106C, applied.

The Union inflated the rat again on April 7th. That afternoon, Reifsteck appeared on site to inform Buss that the rat was in violation of the Town's sign ordinance and needed to come down immediately. Buss testified that Reifsteck also noted that the Union's protest had made the front page of the Appleton Post Crescent, a local paper. Another picketer on site, Mark Linsmeier, testified that he asked Reifsteck what had changed between the time Reifsteck said the rat was allowed and April 7th, and that Reifsteck replied "you've made the front page of the Post Crescent."

16

Neither Buss nor Linsmeier testified that Reifsteck instructed them to remove the rat because of the picture in the paper.

Rather, Reifsteck testified that he gave Buss a copy of the relevant ordinance and that the only reason he instructed the Union to stop using the rat was because it violated Section 535-106C. Linsmeier also testified that Reifsteck did not order the Union to deflate the rat because of the newspaper. Reifsteck informed the Union that it could place the rat in the bed of a truck or mount it in the back of a trailer attached to a truck, so long as the vehicle was mobile. Buss testified that he understood Reifsteck's alternative to mean that the vehicle with the rat would have to be in motion. Buss testified that this method of picketing would be ineffective as it would be in front of other businesses, which were not the subject of the picket, and because it would be dangerous to drive with the 12 foot inflatable rat attached to a vehicle . The Union temporarily used the rat on April 8th and 9th while the Town and Union discussed possible legal action, but ultimately halted its use and commenced this action.

After these events, Buss and Linsmeier photographed several signs throughout the Town which they asserted were signs placed on public rights-of-way. The Union offered the photographs as evidence that the ordinance was not consistently enforced and in support of its claim that the Town's enforcement of the ordinance against the Union was content based. Thiel testified, however, that he investigated each of the photographed signs and recorded his findings. He noted that many of the signs photographed by the Union were located on private property, which are allowed under the ordinance for up to 120 days so long as the owners receive a permit. Thiel's affidavit indicates that of the sixty alleged violations Linsmeier photographed Thiel found only five were placed in the public right-of-way. Thiel Aff., ECF No. 33 at 3–4. The remainder of the photographed signs were

either no longer present at that location, and therefore Thiel could not determine if they were in the public right-of-way, or if they were placed on private property and not in the public right-of-way. *Id*. Likewise, Thiel reviewed the thirty alleged violations Buss photographed and found that nine of the signs were placed in the public right-of-way. *Id*. at 4. The remainder were either on private property or no longer at that location. *Id*. Additionally, Thiel affirmed that he either removed or instructed the owner to remove every sign that was confirmed to be within the public right-of-way. *Id*. at 3–5.

Thiel also discussed the sign used as part of the Grand Chute Fire Department's "Fill the Boot" campaign for the Muscular Dystrophy Association. He explained that because the sign was leaning on an easel, it would be allowed under the sign ordinance so long as it was attended, which it was. In fact, nearby firefighters were collecting donations from passers by. As noted above, the Town had construed the ordinance so as to allow signs that people carried with them or leaned against their lawn chair or car as they engaged in picketing or protesting on public sidewalks. The requirement that such signs be attended and not affixed to the ground was apparently intended to prevent groups from circumventing the ordinance by installing large signs on the public right-of-way and then arranging for individual members to takes shifts around the clock to attend them. Because the "Fill the Boot" signs were not affixed to the ground and were attended, they were not in violation of the ordinance.

Thiel acknowledged that he is not perfect in identifying every time a sign is located in a public right-of-way. He testified, however, that he has never seen a violation and failed to enforce the ordinance against it. From 2013 through 2015, Thiel removed approximately 150 offending signs each year from the public right-of-way. Thiel also testified that all signs in public rights-of-way are

18

deemed safety hazards because of the potential to block or interfere with traffic. He testified he has never given a sign owner more than 24–48 hours to remove a sign in the public right-of-way.

**Based upon the above described testimony and other evidence received at the trial, I find that the the Town did not discriminate in its enforcement of its sign ordinance against the Union on the basis of the content or source of the message conveyed.** I base this finding primarily on the testimony of Eric Thiel, the Town's Code Enforcement Officer. I found Thiel, who was primarily responsible for enforcement of the sign ordinance, to be a credible witness. Thiel testified unequivocally that he did not consider the message or source of the message conveyed by a sign in enforcing the Town's ban on signs in the public right-of-way. The fact that police did not initially take any action against the Union is not evidence of discriminatory enforcement. Violations of the sign ordinance were not considered crimes or quasi-crimes that police dealt with unless they created a safety hazard. They were more in the nature of a zoning violation and were addressed by Thiel in his capacity as the Code Enforcement Officer either on his own initiative when he saw a violation or in response to a citizen complaint. ECF No. 93 at 95, 139–41, 156–57.

With respect to the inflatable rat and cat used by the Union in its demonstration, I find that a complaint from the Kolosso car dealership precipitated the Town's enforcement activities, or at least that was Thiel's understanding. But even though the motivation of the representative of Kolosso who made the complaint was likely content based, I do not attribute that motivation to Thiel. He would not have ordered the rat removed from the public right-of-way unless he was convinced its placement at that location violated the Town's ordinance. The fact that enforcement of the ban on signs in the public right-of-way was precipitated by a person who disagreed with the content of the sign does not mean the Code Enforcement Officer shared that motivation. We do not

19

attribute the motivation of citizens who complain of crimes to the local police department to the law enforcement officer who conducts his own investigation and makes an arrest. If we did, it would render many prosecutions suspect for that reason alone. This is not acceding to a "heckler's veto." It was not the source or volume of the complaint, but the conclusion of the Town officials that the Union's inflatable rat constituted a sign on the public right-of-way in violation of the Town ordinance that led to the removal order. *Cf. Ovadal v. City of Madison*, 416 F.3d 531, 536–37 (7th Cir. 2005) (holding that speech in public forum cannot be banned simply because of the reaction of those who disagree with the message).

Nor is it evidence of discrimination that Thiel did not immediately take action. Realizing the importance of the issue to the Union, and perhaps the likelihood of a lawsuit, Thiel consulted with Lieutenant Reifsteck, GCPD Chief Peterson, and Community Development Director Robert Buckingham before concluding the rat should be removed. ECF No. 93 at 106–07. The issue raised by the Union's actions, as this lawsuit shows, was not a routine violation. Nevertheless, after discussing the matter, all four agreed that the rat was a sign in the public right-of-way within the meaning of the ordinance and had to come down. *Id.* at 109, 201–02. The fact that Thiel consulted with his supervisor and law enforcement demonstrates a desire to avoid unlawful infringement on the Union's rights.

The Union failed to show that the Town's enforcement of its ban on signs in the public right-of-way was not content neutral. With respect to the fire department's "Fill the Boot" campaign, the signs used by firefighters while collecting donations for the Muscular Dystrophy Association were neither affixed to the ground nor left unattended. The fact that Lieutenant Reifsteck did not cite the firefighters is irrelevant in any event since the police typically did not enforce the ordinance. But

regardless, this activity fits well within the exception to the overall ban that the Town had carved out so as to avoid a complete ban on picketing and thereby avoid the very kind of First Amendment violation the Union has charged. *See Taxpayers for Vincent*, 466 U.S. at 810 ("One who is rightfully on a street open to the public 'carries with him there as elsewhere the constitutional right to express his views in an orderly fashion. This right extends to the communication of ideas by handbills and literature as well as by the spoken word.'" (quoting *Jamison v. Texas*, 318 U.S. 413, 416 (1943)). Furthermore, this exception is not applied based on the content of the sign but rather the physical attributes of the sign in relation to the public right-of-way. Therefore, the exception is content neutral, and there is no evidence of it being applied based on content.

The Union's other evidence that the Town selectively enforced the ban on signs in the public right-of-way is similarly unconvincing. The Union produced ninety photographs of signs that the Union believes were in the public right-of-way based off of the signs' locations compared to various physical and geographical markers. Thiel investigated all ninety alleged violations, but he could confirm that only fourteen of them were actual violations. For all fourteen violations identified, he enforced the ordinance and either removed the sign or ordered the owner to remove the sign. Additionally, Thiel testified that he logs roughly 150 violations of signs in the public right-of-way each year. The fact that Thiel may have missed fourteen signs shows evidence of imperfect enforcement but not of discriminatory enforcement. Imperfect enforcement does not render a statute or ordinance invalid. *See Hameetman v. City of Chicago*, 776 F.2d 636, 641 (7th Cir. 1985) ("The Constitution does not require states enforce their laws (or cities their ordinances) with Prussian thoroughness as the price of being allowed to enforce them at all. Otherwise few speeders would

21

have to pay traffic tickets. Selective, incomplete enforcement of the law is the norm in this country.") (citations omitted). If it did, no sign ordinance could survive.

To be sure, the Town did present evidence of uneven enforcement of the provisions governing temporary signs on private property. Notwithstanding the broad language of the ordinance, Thiel testified that he did not regard holiday inflatables (e.g., Santa Claus, Frosty the Snowman) as signs within the meaning of the provisions governing temporary signs on private property. But for the reasons noted above, this evidence has no bearing on the Union's claim in this case. The Union was not denied a permit to place its rat on private property. It wanted to place the rat in the public right-of-way. Thiel was clear that he had never ignored an inflatable, holiday decoration or not, that was located in the public right-of-way. Rules that distinguish between the placement of signs on private and public property are not content based. *Reed*, 135 S. Ct. at 2233 (Alito, J., concurring).

I also find that the Town did not treat violations of Section 535-106C differently based on either the content or source of the message conveyed in ordering immediate removal. Thiel stated in his affidavit that he always immediately confiscated a sign illegally placed in the public right-of-way or ordered the owner to remove it if he could tell who the owner was. ECF No. 33 ¶ 7. When he ordered the sign removed, he generally followed up within 24 or 48 hours to make sure the sign was gone. *Id.* His testimony essentially confirmed his affidavit and was undisputed. He could not recall ever allowing anyone more time to remove a sign from the public right-of-way. ECF No. 93 at 153–54. As I noted in my previous decision, allowing a 30-day grace period to remove such a sign would defeat the purpose of the ban on such signs on the public right-of-way.

In sum, I find that the Town did not engage in discriminatory enforcement of its ban on signs in the public right-of-way. As in *Taxpayers for Vincent*, the ban on signs in the public right-of-way was applied in an evenhanded manner and without regard to content of the message or the identity of the speaker. I also reaffirm my conclusions that the ban is narrowly tailored to serve a significant government interest and it leaves open ample alternative channels for communicating the Union's message.

In determining whether the Town's ban is narrowly tailored to serve a significant government interest, it is important to note that this does not mean that it must be "the least restrictive or least intrusive means of doing so." *Ward*, 491 U.S. at 798. "Rather, the requirement of narrow tailoring is satisfied 'so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.'" *Id.* at 799 (quoting *United States v. Albertini*, 472 U.S. 675, 689 (1985)). "In other words, the Constitution tolerates some over-inclusiveness if it furthers the state's ability to administer the regulation and combat an evil." *Doe v. Prosecutor, Marion Cty.*, 705 F.3d 694, 700 (7th Cir. 2013).

If the goal of eliminating the visual clutter that occurs when people are allowed to place signs on the public right-of-way is lawful, as *Taxpayers for Vincent* clearly holds, then the most direct way and perhaps the only way to lawfully achieve that goal is to ban all signs. 466 U.S. at 808 ("The District Court found that the signs prohibited by the ordinance do constitute visual clutter and blight. By banning these signs, the City did no more than eliminate the exact source of the evil it sought to remedy."). The Union's insistence that an exception be allowed for the placement of its giant inflatable rat and cat on the public right-of-way for labor demonstrations ignores the Town's obligation to draft and apply its ordinance without regard to the message or the messenger. The

23

limited use of the rat or cat may not by itself undermine the Town's goal of avoiding visual assault on its citizens that the ban is intended to prevent, but anything less than a total ban renders the Town susceptible to the very claim that Union has made here—that it is discriminating against speakers on the basis of the content of their message.

The Union's argument that an exception should be created for its temporary placement of the giant inflatables on the public right-of-way also ignores the line-drawing problems that drafting such an exception entails:

> Why does a structure whose nature only requires it to be present for a limited time not undermine the City's objective of keeping the right-of-way clear when a more permanent structure does so? The district court indicates that if the Union wished to leave the inflatable rat in the right-of-way constantly, it would reach a different result. Apx. 46. What exactly constitutes "an extended period of time" that would require resolving this dispute in the City's favor? *Id.* Four hours? Ten? Twenty-four? Alternatively, what public employee is to be given the discretion to determine that amount of time, and how is that discretion to be limited so that time, place, and manner neutrality is maintained?

*Tucker v. City of Fairfield*, 398 F.3d 457, 467 (6th Cir. 2005) (Kennedy, J., dissenting).

As for the third requirement, that there are alternative means of communicating the Union's message, the Union argues that placing the balloon on a moving flatbed truck or trailer would pose safety problems and introduce confusion as to the target of the protest. But as I noted in my previous decision, this still leaves other effective avenues for the Union to communicate its message, including the use of its chosen image. The Union is free to depict the rat in handheld signs, by using smaller rat balloons that are not staked to the ground, by having a member wear a rat or a cat costume. Union members can also carry large banners as part of their demonstration. In short, while the use of its giant inflatable rat and cat may be part of the Union's preferred method of communicating its message, neither are required for it to do so.

24

For all of these reasons, I conclude that the Union's claim against the Town based on its enforcement of its ban on signs in the public right-of-way in April of 2014 fails. That claim will be dismissed and I now turn to its challenge to the Town's current ordinance.

**D. Additional Findings of Fact and Conclusions of Law as to the Claim Under the 2015 Ordinance**

The Union also challenges the constitutionality of the 2015 Ordinance as applied to the placement of its giant rat and cat inflatables on the public right-of-way as part of its labor protests. The Union alleges that there are several recently completed projects where it would have used its inflatables on the public right-of-way, but did not because the Town informed it that its new ordinance, like the old, prohibited such placement. The Union also alleges that there are future projects planned in Grand Chute where it wishes to use its inflatables on the public right-of-way as part of a demonstration. These allegations, which the Town does not dispute, are sufficient to create a case or controversy over which the court has jurisdiction. *Brandt v. Vill. of Winnetka*, 612 F.3d 647, 649–50 (7th Cir. 2010).

The Union offers several challenges to the 2015 Ordinance. First, it argues that the amended ordinance is unconstitutional because it grants "unbridled discretion" to the Town Board to determine whether to allow a permit for a sign encroaching on the public right-of-way under Section535-106D(5). Additionally, the Union argues that the ordinance is content-based discrimination because it bans inflatables in the public rights-of-way but allows them on private property. Lastly, the Union argues that the Town's amended ordinance was passed with an impermissible, content-based motivation to prohibit the Union from using the inflatable rat.

25

Section 535-106D(5) of the 2015 Ordinance states: "No part of a sign may be located in public road right-of-way unless allowed by the Town Board approval because of unique circumstances or unusual hardship." The Union argues that this provision grants "unbridled discretion" to the Town Board and therefore cannot be content neutral. As noted above, if an ordinance vests unbridled discretion in a government official to grant or deny the permit, the ordinance is facially unconstitutional. *City of Lakewood*, 486 U.S. at 759; *see also Forsyth Cty. v. Nationalist Movement,* 505 U.S. 123, 130–31 (1992) ("A government regulation that allows arbitrary application is 'inherently inconsistent with a valid time, place, and manner regulation because such discretion has the potential for becoming a means of suppressing a particular point of view.'" (quoting *Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 649 (1981))).

To be sure, the exception to the ban on signs in the public right-of-way for those signs approved by the Town Board "because of unique circumstances or unusual hardship" complicates the analysis. The Town argues that the Union's argument fails because Section 535-106D is not applicable to the inflatables it seeks to use in its demonstration. Under the 2015 Ordinance, inflatables such as the Union's rat and cat are governed by Section 535-106F(5), which states:

> Inflatable signs. Inflatable signs are permitted only on lots in the Community Center sign district. All inflatable signs must be placed a minimum of 10 feet away from any property line, and must be directly anchored to the ground with a tether having a maximum length of 5 feet. Inflatable signs require a permit and may be in use for a maximum of 5 days in any consecutive 6-month period.

Ex 22 at 9. The Community Center sign district is composed of lands zoned as office commercial, local commercial, regional commercial, planned commercial, and industrial districts. § 535-105. Although the testimony on this issue was not entirely clear, I find that the Town has interpreted the exception in Section 535-106D, which allows a part of a sign to protrude into the public right-of-way

26

when approved by the Town Board "because of unique circumstances and unusual hardship," to apply only to permanent signs erected by property owners. ECF No. 93 at 131–32. It has no application to inflatable signs, which are separately defined in the 2015 Ordinance to mean "[a]ny sign constructed of fabric or other flexible material that takes on a three-dimensional shape when filled with air." § 535-105, Ex. 22 at 4. Under the 2015 Ordinance, an inflatable sign would never be allowed to be affixed to the ground in the public right-of-way. ECF No. 93 at 131–32. Thus, use of the Union's inflatables on the public right-of-way is not subject to or conditioned upon the unbridled discretion of the Town Board or any Town official.

Nor is the prohibition of the placement of giant inflatables on the public right-of-way content based. It applies to the Michelin Tire Man, the Stay Puft Marshmallow Man, Santa Claus, Frosty the Snowman, or any other cartoon figure inflatable, no less than the Union's rat or cat. The Town prohibits any and all persons from affixing any and all giant inflatables to the public right-of-way, regardless of what the message is or who the messenger might be. This prohibition falls well within the kind of content-neutral restrictions that *Reed* held remain available:

> The Town has ample content-neutral options available to resolve problems with safety and aesthetics. For example, its current Code regulates many aspects of signs that have nothing to do with a sign's message: size, building materials, lighting, moving parts, and portability. . . . And on public property, the Town may go a long way toward entirely forbidding the posting of signs, so long as it does so in an evenhanded, content-neutral manner.

135 S. Ct. at 2232.

Finally, the Union claims that the 2015 Ordinance's ban on affixing inflatables to the public right-of-way is unconstitutional because the Town officials responsible for revising its sign ordinance had the Union's lawsuit in mind when they did so. The Union contends that the 2015 Ordinance was

"specifically motivated by animus against the Union" and that the "avowed purpose" of the revisions was to prohibit the Union from using its inflatable rat. ECF No. 96 at 19–21.

I do not find this to be the case. It is true that the individuals involved in revising the Town's sign ordinance, Thiel and Buckingham, were aware of the litigation that had been pending with the Union and drafted the revisions with that lawsuit in mind. ECF No. 93 at 130. But that doesn't mean they were motivated by animus toward the Union or its message. It only means that they did not want giant inflatables affixed to the Town's public rights-of-way. It is only natural when revising a law or ordinance to try to clarify issues that were less clear than intended in the earlier version of the law. That's why revisions are done. And that's why, according to Thiel's testimony, the revisions that were intended to make clear inflatables could not be affixed to the public rights-of-way were made. *Id.* at 135. Again, I find no evidence that either were motivated by anti-union animus; they were motivated by a desire to clear up any confusion that might have existed. True, the Union was the only entity seeking to affix giant inflatables to the public right-of-way, but that only means that the issue never arose before the Union undertook to conduct its demonstration. There is no reason to believe that the Town would not have taken the same action, both in enforcing the 2014 Ordinance or in drafting and enacting the 2015 Ordinance, if instead of the Union affixing its rat to the public right-of-way, a local theater had affixed a giant Mickie Mouse inflatable there.

## CONCLUSION

The Town of Grand Chute, like many communities, places greater aesthetic value on uncluttered public rights-of-way more than the messy cacophony of signs that would otherwise arise at those locations. As long as it has acted in an evenhanded manner and the Union has other ways to get its message across, the Supreme Court has said it is free to do so without running afoul of the

First Amendment to the United States Constitution. In its amended complaint, the Union also asserted identical claims under the Equal Protection Clause of the Fourteenth Amendment and the corresponding provisions of the Wisconsin Constitution. Having offered neither argument nor authority supporting those claims, I conclude that the Union has abandoned them. I therefore conclude that the Union's claims against the Town must be dismissed. The Clerk is directed to enter judgment in favor of the Town and against the Union with costs as allowed by statute.

**SO ORDERED** this ___14th___ day of March, 2018.

s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court